969 So.2d 473 (2007)
Robert FREEMAN, Appellant,
v.
STATE of Florida, Appellee.
No. 5D06-2395.
District Court of Appeal of Florida, Fifth District.
November 16, 2007.
*474 James S. Purdy, Public Defender, and Brynn Newton, Assistant Public Defender, Daytona Beach, for Appellant.
Bill McCollum, Attorney General, Tallahassee, and Ann M. Phillips, Assistant Attorney General, Daytona Beach, for Appellee.
PLEUS, J.
Freeman appeals his conviction for manslaughter after his six pit bulls mauled an *475 elderly neighbor to death. He makes two arguments. First, he argues that the trial court erred in denying his motion for judgment of acquittal because the actions alleged and proved were specifically prohibited by the "Dangerous Dog Act," section 767.13(2), Florida Statutes (2003). Second, he claims that even if he was properly charged with manslaughter, the trial court erred in denying his requested instruction on the lesser-included offense based on the Dangerous Dog Act. We affirm.

Facts
The State's information charged Freeman with manslaughter by culpable negligence. It alleged that Freeman
did through culpable negligence, without intent to harm, and without lawful justification, caused upon ALICE BROOM wounds and injuries which resulted in the death of said ALICE BROOM, a human being, by having specific knowledge that his dogs had the propensity to act in an aggressive manner, and having this knowledge he engaged in a course of reckless disregard for human life by allowing his dogs to escape confinement, said dogs having escaped confinement and attacked and mauled to death ALICE BLOOM [sic], in violation of Florida Statute 782.07
On the afternoon of December 12, 2003, in Citra, Florida, the Marion County Sheriff's Office received a 911 call from Freeman stating that he had just returned home from work to find his neighbor, Alice Broom, "almost dead" with a hole in her neck and his dogs still chewing on her. Freeman said the dogs had gotten out of the house and attacked Broom. Freeman asked the 911 operator to call the dog people and tell them to come get his dogs because he "should have got rid of them a long time ago." Freeman could see his front door hanging open.
Paramedics arrived to find Ms. Broom lying unconscious on the ground in the fetal position. She was half clothed; the rest of her clothes were strewn around the yard. She had a "big chunk" out of her neck and her arms had been "chewed away." She was transported to the hospital where she was pronounced dead. The police evidence technician who photographed Broom's body described it as being covered "from head to toe . . . in dirt, bite marks, scratches, [and] puncture wounds."
The medical examiner testified that Broom died from loss of blood and multiple skin and soft tissue injuries. The location of the injuries evinced defensive efforts consistent with curling up in a fetal position.
Freeman admitted to several witnesses that his dogs attacked Broom. The State also called a forensic odontologist, who testified based on his comparison of teeth impressions to Broom's injuries that all six of Freeman's dogs had attacked Broom.
A veterinarian testified that all six dogs were part pit bull, which are intentionally bred for aggressiveness. The more dogs in a group, the more they act as a pack.
Sheriff's detectives found Freeman's mobile home in "tremendous disrepair." There were dog droppings inside and there was no electricity or water. There was a hole where the door knob should be in the front door. Freeman told detectives that he tied the door shut with electrical cord and exited out the back door. However, one detective described the door as being bowed outward and "having tremendous give" when pushed.
Ms. Broom's daughter testified that she saw Freeman's dogs outside everyday and they would run away from his property. Additionally, several witnesses testified *476 about prior attacks by Freeman's dogs in the year preceding Ms. Broom's death.
In January 2003, Charlie Sumpter was walking near Freeman's property when six or seven of Freeman's pit bulls charged out from under Freeman's trailer, knocked Sumpter to the ground and bit him about eight times. The dogs ripped off Sumpter's pants and left scars on his legs, which he showed to the jury. Freeman came outside, yelled at the dogs and pulled them off Sumpter. When Sumpter told Freeman he was going to the hospital, Freeman became angry and said the dogs had a right to bite him because he was walking on Freeman's property.
In April 2003, Charlie Dennison was walking down the street when three of Freeman's pit bulls ran out of his yard and attacked Dennison. Dennison fell down but managed to fight them off. The dogs bit his calves, tearing his pants and causing him to bleed. Dennison showed the jury his scars. Freeman ran outside and said he thought the dogs were in the house.
In September 2003, Ms. Broom's great-grandson, Jamal Williams, was walking the family dachshund on the street in front of Ms. Broom's house when six of Freeman's dogs appeared, grabbed the leash from him and attacked the dachshund. He tried to beat them off with a stick but they kept attacking. Suddenly, the dogs stopped attacking, which allowed Williams to carry the dog away. They took the dachshund to the vet, who stopped the bleeding. Pictures of the dachshund's injuries were shown to the jury. The next day, Freeman was angry because Williams' grandmother had called animal control.
The code enforcement officer who responded to the call went to Freeman's house. Freeman was not home but there were six or eight dogs loose in front of his trailer. Williams identified them as the dogs that attacked his dachshund.
Also around September 2003, Ms. Broom's nephew, Lorenzo Colding, was walking down the street near Broom's house when six of Freeman's dogs attacked him. All six dogs bit his pants legs but did not break the skin. Freeman came outside and called off his dogs.
Around October 2003, Ms. Broom's grandson, Andrew Williams, was walking along the walking path that everyone used when Freeman's dogs came from Freeman's yard and began growling at Williams. The dogs tore holes in Williams' pants and bit him four or five times. Freeman came outside and called his dogs off Williams. Williams went to the doctor to get a tetanus shot.
In November 2003, Willy Clinton was walking on the street near where Ms. Broom was later killed when Freeman's dogs came running out of Freeman's house, through the front door, and attacked Clinton. The dogs surrounded him "like a pack mentality"one would act like it was going to attack but then another would attack. Clinton's pants were torn and he was bitten in the thigh. After 15 or 20 minutes, Freeman came outside, retrieved his dogs and started petting and kissing them. Clinton, who bred dogs, told Freeman it was not right to reward the dogs for biting people and said he needed to do something with the dogs because sooner or later they were going to hurt or kill someone. Clinton called code enforcement and filed a report.

Discussion
A. Denial of Motion for Judgment of Acquittal
Freeman moved for judgment of acquittal, arguing that he should have been charged under section 767.13(2), Florida Statutes (2003), commonly referred to as *477 the "Dangerous Dog Act." See Huie v. Wipperfurth, 632 So.2d 1109, 1112 (Fla. 5th DCA 1994), approved, 654 So.2d 116 (Fla.1995). On appeal, Freeman argues that the trial court erred in denying his motion for judgment of acquittal because the acts charged as manslaughter, a second degree felony, actually constituted a more specific offense in section 767.13(2), a second degree misdemeanor. That sections states:
If a dog that has not been declared dangerous attacks and causes severe injury to or death of any human, the dog shall be immediately confiscated by an animal control authority, placed in quarantine, if necessary, for the proper length of time or held for 10 business days after the owner is given written notification under s. 767.12, and thereafter destroyed in an expeditious and humane manner. This 10-day time period shall allow the owner to request a hearing under s. 767.12. The owner shall be responsible for payment of all boarding costs and other fees as may be required to humanely and safely keep the animal during any appeal procedure. In addition, if the owner of the dog had prior knowledge of the dog's dangerous propensities, yet demonstrated a reckless disregard for such propensities under the circumstances, the owner of the dog is guilty of a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083.
§ 767.13(2), Fla. Stat. (2003) (emphasis added).
Freeman relies primarily on a rule of statutory construction which requires that a specific statute controls over a general statute. As explained by the Florida Supreme Court in Adams v. Culver, 111 So.2d 665, 667 (Fla.1959):
It is a well settled rule of statutory construction, however, that a special statute covering a particular subject matter is controlling over a general statutory provision covering the same and other subjects in general terms. In this situation "the statute relating to the particular part of the general subject will operate as an exception to or qualification of the general terms of the more comprehensive statute to the extent only of the repugnancy, if any." It has been said that this rule `is particularly applicable to criminal statutes in which the specific provisions relating to particular subjects carry smaller penalties than the general provision.'
(Citations omitted). See also Burnett v. State, 737 So.2d 1106, 1107 (Fla. 1st DCA 1998).
The State argues that "[t]here first must be a hopeless inconsistency between the two statutes before rules of construction are applied to defeat the express language of one of those statutes." State v. Parsons, 569 So.2d 437, 438 (Fla. 1990). "In other words, it is improper to resort to the canons of statutory construction when the texts of different statutes are plain and unambiguous." Limbaugh v. State, 887 So.2d 387, 397 (Fla. 4th DCA 2004).
Thus, the threshold issue is whether the two statutes can be read in harmony with each other, so that each statute can be enforced without doing violence to the language of the other. Section 782.07(1), Florida Statutes (2003) states:
The killing of a human being by the act, procurement, or culpable negligence of another, without lawful justification according to the provisions of chapter 776 and in cases in which such killing shall not be excusable homicide or murder, according to the provisions of this chapter, is manslaughter, a felony of the second degree, punishable as *478 provided in s. 775.082, s. 775.083, or s. 775.084.
(Emphasis added). The type of manslaughter applicable to this case is by culpable negligence rather than act or procurement. Florida Standard Jury Instruction (Criminal) 7.7, Manslaughter, defines culpable negligence as follows:
I will now define "culpable negligence" for you. Each of us has a duty to act reasonably toward others. If there is a violation of that duty, without any conscious intention to harm, that violation is negligence. But culpable negligence is more than a failure to use ordinary care toward others. In order for negligence to be culpable, it must be gross and flagrant. Culpable negligence is a course of conduct showing reckless disregard of human life, or of the safety of persons exposed to its dangerous effects, or such an entire want of care as to raise a presumption of a conscious indifference to consequences, or which shows wantonness or recklessness, or a grossly careless disregard for the safety and welfare of the public, or such an indifference to the rights of others as is equivalent to an intentional violation of such rights.
The negligent act or omission must have been committed with an utter disregard for the safety of others. Culpable negligence is consciously doing an act or following a course of conduct that the defendant must have known, or reasonably should have known, was likely to cause death or great bodily injury.
(Emphasis added).
Although both crimes employ the phrase "reckless disregard," which may create ambiguity as to which statute applies, there are some notable differences. In particular, section 767.13(2) only requires proof of the dog owner's "knowledge of the dog's dangerous propensities" and a "reckless disregard for such propensities under the circumstances." The statute does not define the phrase "dangerous propensities" but it broadly defines a "dangerous dog" as one which
(a) Has aggressively bitten, attacked, or endangered or has inflicted severe injury on a human being on public or private property;
(b) Has more than once severely injured or killed a domestic animal while off the owner's property;
(c) Has been used primarily or in part for the purpose of dog fighting or is a dog trained for dog fighting; or
(d) Has, when unprovoked, chased or approached a person upon the streets, sidewalks, or any public grounds in a menacing fashion or apparent attitude of attack, provided that such actions are attested to in a sworn statement by one or more persons and dutifully investigated by the appropriate authority.
§ 767.11(1), Fla. Stat. (2003).
In contrast, manslaughter by culpable negligence requires more than knowledge of a dog's "dangerous propensities." It requires knowledge that his negligent act or omission is "likely to cause death or great bodily injury." Thus, if a dog owner knew that his dog had been used in dog fighting or had "approached a person . . . in a menacing fashion," he could have knowledge of the dog's "dangerous propensities" under section 767.13(2) but not necessarily knowledge that his failure to contain the dog would be "likely to cause death or great bodily injury" under section 782.07(1).
In addition, the manslaughter statute arguably requires a higher standard of recklessness. While section 767.13(2) requires "reckless disregard for such propensities *479 under the circumstances," section 782.07(1) requires a course of conduct showing (1) reckless disregard of human life, (2) reckless disregard of the safety of persons exposed to its dangerous effects, (3) such an entire want of care as to raise a presumption of a conscious indifference to consequences, (4) wantonness or recklessness, (5) a grossly careless disregard for the safety and welfare of the public, or (6) such an indifference to the rights of others as is equivalent to an intentional violation of such rights. Fla. Std. Jury Instr. (Crim.) 7.7.
The manslaughter statute is more narrowly focused on reckless conduct affecting human life, human safety, or the safety and welfare of the public. The dangerous dog statute is more broadly focused on reckless disregard of a dog's behavior to people and animals.
Thus, even though the two statutes employ the phrase "reckless disregard," it is clear from an examination of the plain language of these statutes that they require proof of different levels of knowledge and recklessness.
Even if we were to conclude that the two statutes are ambiguous, unclear or inconsistent, prior decisions support the State's position that it had discretion to charge Freeman with either manslaughter or the lesser crime. In McCreary v. State, 371 So.2d 1024 (Fla.1979), the defendant was convicted of vehicular homicide after running a stop sign and killing the occupant of another vehicle. On appeal, he argued that the trial court should have granted his motion for judgment of acquittal because the "reckless" standard of proof for vehicular homicide was the same as the "culpable negligence" standard for manslaughter and the State had not met that standard. Id. at 1025.
The supreme court disagreed, finding that the legislature intended to created two different level felonies with different standards of proof. The court reasoned as follows:
Certainly, it is within the authority of the legislature to make punishable as a third-degree felony reckless driving which results in the killing of a human being where the degree of negligence falls short of culpable negligence but where the degree of negligence is more than a mere failure to use ordinary care. The present case is a good example of why the legislature would enact such a law. The State's evidence in the present case is not sufficient to establish that the defendant's conduct was of such a gross and flagrant character as to support a finding of culpability sufficient to sustain a conviction for manslaughter. The evidence, however, does show that the defendant killed another human being by the operation of a motor vehicle in "a reckless manner likely to cause the death of, or great bodily harm to, another" and is sufficient to support a conviction for vehicular homicide. . . .
It is not unreasonable for the legislature to create a lesser included offense to cover the hiatus between section 782.071 manslaughter and the traffic offense of reckless driving created by section 316.029, Florida Statutes (1975). If the facts had been different, the State might have elected to charge the defendant with the higher offense of manslaughter. For example, if the defendant had raced through the stop sign at an excessive rate of speed in a deliberate effort to beat another motor vehicle that he saw approaching the intersection or if the defendant was playing "chicken" with another vehicle, these facts might have justified the State's charging and the jury's convicting the defendant of manslaughter. In the *480 present case, the State properly charged and the jury convicted the defendant of the lesser offense of vehicular homicide.
Id. at 1026-27 (footnote omitted; emphasis added).
Two months later, in State v. Young, 371 So.2d 1029 (Fla.1979), the supreme court reached the same conclusion based on a different factual and procedural scenario. The defendant in Young was charged with manslaughter after his tractor-trailer struck a car, killing its driver. The trial court dismissed the information with leave to charge the defendant with vehicular homicide. The district court agreed, reasoning that the vehicular homicide statute was later in time and dealt more specifically with killing by negligent operation of a vehicle.
On certification to the supreme court, the dissent argued that "if a statute of general application conflicts with a statute of more specific application, the latter should prevail," citing to Adams v. Culver. Id. at 1031 (Boyd, J., dissenting). However, the majority rejected this argument based upon its reasoning in McCreary, holding that "in a prosecution for homicide arising out of the negligent operation of a motor vehicle, the State may elect to charge the defendant under the manslaughter statute." Id. at 1030.
Freeman's only retort to Young is that both manslaughter and vehicular homicide are contained within the homicide chapter in the Florida Statutes, but in this case, the legislature created a separate chapter dealing with dangerous dogs. He notes the legislature expressly stated that it was creating this new chapter because "existing laws inadequately address this growing problem." § 767.10, Fla. Stat.[1]
This distinction does not overcome the reasoning in Young. If anything, it makes a stronger case for the State. As the State notes, Chapter 767 is located under Title 45, dealing with torts, rather than Title 46, dealing with Crimes. This placement actually strengthens the State's argument that the legislature intended to punish different levels of conduct. Accordingly, we believe the State had discretion to charge Freeman with manslaughter.
B. Denial of Requested Jury Instruction
Freeman requested an instruction on section 767.13(2) as a lesser included offense, but did not give the trial court any legal reasons for the request. The trial court denied the request, finding that culpable negligence was the only lesser included offense.
On appeal, Freeman argues that if both crimes were authorized, then the trial court erred in failing to instruct the jury on section 767.13(2) as a lesser-included offense of manslaughter for two reasons. First, he claims the requested lesser offense was "wholly included" in the charged offense. Second, he argues that the dangerous dog offense was only one step removed from the manslaughter offense.
"In order to be preserved for further review by a higher court, an issue must be presented to the lower court and *481 the specific legal argument or ground to be argued on appeal or review must be part of that presentation." Baker v. State, 937 So.2d 297 (Fla. 4th DCA 2006). Although Freeman requested the instruction below, he failed to explain why he was requesting it. He made no argument below, much less either of the arguments he now makes on appeal. Accordingly, his arguments were not properly preserved.
Even if Freeman had preserved this argument, we conclude the trial court's denial of Freeman's requested instruction resulted in harmless error. Reversible error occurs when a trial court denies a requested instruction on the next lesser-included offense "if the charging instrument and the evidence admitted would support a conviction on the next lesser offense." Moore v. State, 932 So.2d 524, 527 (Fla. 4th DCA 2006) (citing State v. Abreau, 363 So.2d 1063 (Fla.1978)). However, when the requested instruction pertains to a lesser-included offense which is two or more steps removed from the charged offense, the error is not per se reversible, but rather, is subject to harmless error analysis. Pena v. State, 901 So.2d 781, 787 (Fla.2005).
In the instant case, the information and evidence both support giving the requested instruction on section 767.13(2). The State does not contest this point. However, it correctly argues that this crime was two steps removed from manslaughter, and therefore, the error was subject to harmless error analysis. Freeman's argument that the requested lesser was only one step removed is based on the mistaken assertion that the lesser-included offense of culpable negligence, which was presented to the jury, was a second degree misdemeanor. In fact, it was a first degree misdemeanor.
Section 784.05(2), Florida Statutes (2003) states, in pertinent part:
(1) Whoever, through culpable negligence, exposes another person to personal injury commits a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083.
(2) Whoever, through culpable negligence, inflicts actual personal injury on another commits a misdemeanor of the first degree, punishable as provided in s. 775.082 or s. 775.083.
"The degree of punishment for such acts depends on whether injury is inflicted. If so, the crime is a misdemeanor of the first degree; if not, a misdemeanor of the second degree." State v. Greene, 348 So.2d 3, 4 (Fla.1977). In the instant case, the unrefuted evidence established that fatal injuries were inflicted. Thus, the culpable negligence in this case was a first degree misdemeanor. Consequently, the requested lesser-included violation of section 767.13(2) was two steps removed and the error in denying the instruction is subject to harmless error analysis.
The State argues that the error was harmless because the jury was given a fair opportunity to exercise its pardon power by finding Freeman guilty of culpable negligence but it failed to do so. This factor has been determinative in several cases involving failure to instruct on a lesser-included offense two or more steps removed from the charged offense. See, e.g. State v. Iseley, 944 So.2d 227 (Fla. 2006); Abreau; Johnson v. State, 855 So.2d 1157 (Fla. 4th DCA 2003).
In addition, the evidence of guilt in this case was overwhelming. There was ample evidence that Freeman knew his dogs had escaped from his trailer and attacked passersby on several prior occasions. Yet on the day of Ms. Broom's death, Freeman went to work, leaving his dogs free to *482 escape and attack passersby, as they had done many times in the recent past.
AFFIRMED.
PALMER, C.J. and LAWSON, J., concur.
NOTES
[1] The entire section states:

The Legislature finds that dangerous dogs are an increasingly serious and widespread threat to the safety and welfare of the people of this state because of unprovoked attacks which cause injury to persons and domestic animals; that such attacks are in part attributable to the failure of owners to confine and properly train and control their dogs; that existing laws inadequately address this growing problem; and that it is appropriate and necessary to impose uniform requirements for the owners of dangerous dogs.